**JAMES CITY COUNTY, VIRGINIA, Plaintiff,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and United States Army Corps of Engineers, Defendants.**

**Civ. A. No. 89–156–NN.**

United States District Court, E.D. Virginia, Newport News Division.

Nov. 8, 1990.

See also 131 F.R.D. 472.

William B. Ellis, Stephen T. Gannon, Bryan G. Redd, McSweeney, Burtch & Crump, P.C., Richmond, Va., Frank M. Morton, County Atty., Williamsburg, Va., for plaintiff.

David W. Carr, Jr., Charlottesville, Va., for Conservation intervenors.

Craig B. Shaffer, Environmental Defense Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., Susan L. Watt, Asst. U.S. Atty., Norfolk, Va., Dov Weitman, U.S. E.P.A., Office of Gen. Counsel, Peter W. Colby, Environmental Defense Section, Environment and Natural Resources Div., U.S. Dept. of Justice, Carl W. Ulrich, Alison L. Taylor, Davis, Braham and Stubbs, Washington, D.C., Ann Powers, Vice President and Gen. Counsel, Chesapeake Bay Foundation, Inc., Annapolis, Md., Roy A. Hoagland, Virginia Staff Atty., Chesapeake Bay Foundation, Inc., Richmond, Va., for defendants.

## MEMORANDUM OPINION AND ORDER

MacKENZIE, District Judge.

Plaintiff James City County ("County") brought suit against defendants, United States Environmental Protection Agency ("EPA") and United States Army Corps of Engineers ("Corps") after the EPA, acting under Section 404(c) of the Federal Water Pollution Control Act of 1972, vetoed the Corps' decision to permit the placement of dirt fill to construct a dam for the proposed Ware Creek Reservoir. Both plaintiff and defendants moved for summary judgment. Thereafter, the entire administrative record was submitted to this Court. The Southern Environmental Law Center, the National Wildlife Federation, the Virginia Wildlife Federation and the Chesapeake Bay Foundation participated in this action as amici curiae.

### I.

James City County, adjacent to Williamsburg, Virginia, located on the York–James Peninsula, is the second fastest-growing county in Virginia. Currently, it receives its supply of water from two separate water systems. The James City County System provides the County with 1.9 million gallons of water per day, predominantly derived from groundwater. The City of Newport News System supplies the County with 5.4 million gallons of water per day. At its peak, the Newport News System could supply James City County with 7.7 million gallons of water per day.

Beginning in 1979, consultants alerted James City County that severe water shortages were inevitable if the County did not take action to meet its growing water supply needs. Numerous water studies were conducted, and, as a result, a figure of 18.2 million gallons per day was determined to be necessary to fulfill the County's water needs through the year 2030. Thus, James City County found itself faced with the unenviable task of finding a reliable, practical way to meet a 10.5 million gallon per day water deficit.

Further water studies ensued—at least sixteen water supply studies were conducted by federal, state and private authorities over a ten year period. Based on the aforementioned studies, James City County and the Corps concluded that constructing a reservoir on Ware Creek was the only practical long term solution. The proposed reservoir would be situated along the border of James City and New Kent Counties, approximately one thousand feet downstream from the confluence of Ware Creek and France Swamp. Capacity of the reservoir would be over six thousand million gallons at a normal pool elevation of thirty-five feet. Most importantly, the project would provide a safe yield of 9.4 million gallons of water per day.

Between 1982 and 1984, James City County laid the groundwork for obtaining a permit to place fill for the Ware Creek Reservoir. Under the Federal Water Pollu-

tion Control Act of 1972, such a permit is required from the Corps before any fill material is discharged into navigable waters.[1] In preparation for its permit, the County purchased land in the area to forestall residual development and created a Reservoir Protection Overlay District to restrict incompatible land uses in the watershed. In addition, James City County obtained the consent of neighboring New Kent County to use a portion of New Kent County's property for the reservoir.

In 1984, the groundwork set, James City County formally filed an application with the Corps for a fill permit. Pursuant to the National Environmental Policy Act, the Corps directed an extensive review of the Ware Creek Reservoir project.[2] The Corps then solicited EPA's assistance as a "cooperating agency" in preparing a Final Environmental Impact Statement for the project. In the meantime, James City County hired numerous experts at considerable county expense to ensure that any issues raised by EPA could be addressed.

The Corps published its Final Environmental Impact Statement in October of 1987. The Corps' statement had taken an additional two years on account of EPA's exhortations that further investigations be done. EPA's contribution to the statement, nonetheless, was a scant two and a half pages of commentary, the crux of which was EPA's contention that the Commonwealth of Virginia was not doing enough to encourage regional as opposed to local water supply development.[3]

Representatives from James City County, sensing a growing rift between the Corps and EPA over the project, approached the EPA with several mitigation plans. The County representatives hoped that a suitable plan would perhaps lead to a compromise upon which both EPA and the Corps could agree. EPA's response to James City County's overtures was that the proposed placement of fill was simply "unmitigatable".[4]

On July 11, 1988 the Corps announced its decision that James City County should be granted a permit to place fill in Ware Creek. In its Record of Decision, the Corps found that no agency, including EPA, had identified any practicable, environmentally preferable alternatives for meeting James City County's desperate need for water.[5] Moreover, the Corps found that James City County had taken all the appropriate steps to minimize any adverse effects of the project.[6]

Notwithstanding the Corps favorable findings, James City County, with the assistance of such agencies as the Fish and Wildlife Service, continued to work on a new, more extensive mitigation plan. In August of 1988, the County formally submitted a plan which included a 1.15 million dollar fund to preserve thousands of acres of top priority wetlands. James City County asked the Corps to integrate this plan into any final permit.

Nevertheless, after ten years of supposed cooperation, dozens of experts, countless water studies and a bevy of mitigation proposals, the EPA, on November 18, 1988, vetoed the Corps' overwhelming ratification of the proposed placement of fill. As a result, the Corps was estopped from granting James City County the permit to which the Corps held the County was entitled.

## II.

A. *EPA Incorrectly Presumed That James City County Had Alternatives Available To The Ware Creek Reservoir.*

Under Section 404(a) of the Clean Water Act (the "Act"), 33 U.S.C. § 1344 (1982), the Secretary of the Army, acting through the Corps, is authorized to issue permits for the discharge of dredged or fill

---

1. *Federal Water Pollution Control Act of 1971,* 33 U.S.C. § 1344.

2. *National Environmental Policy Act,* 42 U.S.C. § 4321 et seq.

3. *Administrative Record,* B–22.

4. Complaint para. 48, Answer para. 48.

5. *Record of Decision,* Administrative Record A–54 at 5.

6. 404(b)(1) Analysis, *Administrative Record,* A–54 at 8.

material into navigable waters at specified disposal sites. In determining whether to issue permits, the Corps is directed in Section 404(b) of the Act to apply the guidelines developed by the EPA. 33 U.S.C. § 1344(b) (Supp. III, 1985). These guidelines appear as 40 C.F.R. Part 230 (1987).

Once the Corps has set forth its intention to issue a particular permit, the EPA is empowered to veto said permit. Pursuant to Section 404(c) of the Act, if the EPA finds that the discharge of the fill material into the specified site will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas, wildlife, or recreational areas, the EPA may prohibit the discharge. 33 U.S.C. § 1344(c). The EPA is charged with consulting the guidelines expressed in 40 C.F.R. Part 231 (1987).

"Unacceptable adverse effect" is defined in 40 C.F.R. § 231.2(e) as:

> ... impact on an aquatic or wetland ecosystem which is likely to result in significant degradation of municipal water supplies (including surface or ground water) or significant loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas.

The regulation goes on to say that in evaluating the unacceptability of such impacts, the EPA should consider the relevant portions of the Section 404(b)(1) guidelines. The Section 404(b)(1) guidelines direct the considering authority to examine practicable alternatives to the proposed discharge. See 40 C.F.R. § 230.5(c). According to section 230.10(a)(2) of the 404(b)(1) guidelines, an alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes.

In concluding that the Ware Creek Reservoir will have an unacceptable adverse effect, EPA based its finding on the fact that "there are practicable, less environmentally damaging alternatives that are available to James City County for the purpose of providing a water supply to meet the projected need for the County".[7]

However, EPA's findings do not support EPA's absolute conclusion that there are practicable alternatives available to James City County.

While EPA did present several possible alternatives in its Final Determination, EPA never stated that any of these alternatives could actually be implemented by James City County. For instance, in discussing the possibility of a three-dam project, and a greater reliance on groundwater, EPA merely said that there was "insufficient information" in the record to show that those alternatives were not available.[8] Concluding, as EPA did, that those alternatives could not be disproved is certainly not the same as stating that there are alternatives currently available. In other words, EPA employed a presumption that available alternatives did exist.

EPA argues that such a presumption is permissible under the Section 404(b)(1) guidelines. Yet, the Section 404(b)(1) guidelines expressly revoke any presumption in this case. The Section 404(b)(1) guidelines state that:

> (3) Where the activity associated with a discharge which is proposed for a special aquatic site (as defined in Subpart E) does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e. is not "water dependent"), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise.[9]

Here, "the activity associated with a discharge"—construction of a reservoir—must be located in wetlands to fulfill its

---

7. *Final Determination,* A.R. L–40 at 4.

8. *Final Determination,* L–40 at 56–57, 59, 60, 61, 62.

9. 40 C.F.R Part 230.10(a)(3).

basic purpose of impounding a stream. Thus, as EPA may have overlooked, a reservoir is considered to be a water dependent activity. As a result, there is no presumption that practicable alternatives that do not involve special aquatic sites are available. Furthermore, EPA's pet alternative, the three dam project, does entail a discharge into a special aquatic site. Consequently, there is no presumption that the three dam project would have less adverse impact.

EPA's duty in policing the discharge of fill material is clearly set forth in Section 404(c). The statute asserts that the EPA must show that the discharge of fill material *will* have an unacceptable adverse effect on the wetlands site. As noted, EPA premised its prohibition of the discharge for the Ware Creek Reservoir on the fact that James City County did have other alternatives. But, EPA has yet to demonstrate that James City County does have alternatives available, only that James City County *may* have available alternatives. Thus, EPA has not met its statutory duty of showing that the discharge necessary for the Ware Creek Reservoir will have an unacceptable adverse effect.

B. *Notwithstanding EPA's Incorrect Presumptions, The Alternatives Cited By EPA Are Not Available.*

■ In its *Final Determination,* EPA summoned several alternatives which EPA asserted could serve as a substitute for the Ware Creek Reservoir in relieving James City County's water woes. Specifically, EPA mentioned a three dam project and increased groundwater production, perhaps used in combination, as the most promising alternatives.

The three dam project involves the construction of three small ponds in three branches of the Ware Creek watershed. Ware Creek lies on the border of James City County and New Kent County. Consequently, construction of the three dam project would not be possible without the permission of New Kent County. New

Kent County, nevertheless, unequivocally opposes the three dam project. Moreover, New Kent County is not the only institutional obstacle confronting the three dam project. *The EPA itself has stated that it would oppose such a project on the grounds that no water supply impoundment should be permitted on Ware Creek.*[10] For EPA to advance the three-dam project as an acceptable alternate where the EPA itself has already opposed that project is pure nonsense.

In addition, it is worth pointing out that even if EPA and New Kent County had agreed to the three dam project, the three dam project would be less practical and arguably more environmentally hazardous than the Ware Creek Reservoir. The Ware Creek Reservoir would be equipped to yield 9.4 million gallons of water. The three dam project would yield only 6.1 million gallons of water, leaving James City County far short of its water needs. Furthermore, the Ware Creek Reservoir yield could be expanded as the County's water needs grew without affecting additional wetlands. The yield from the three dam project, alternatively, would be fixed. Finally, as to cost, water from the three dam project would cost fifty percent more per gallon than water from the Ware Creek Reservoir.

Turning to EPA's groundwater alternative, this alternative is as implausible as the three dam project. Following a decade long study of the groundwater supply on the Lower Peninsula, the United States Geological Survey concluded that the use of groundwater by James City County must be minimized. In response to this alarming study, the State Water Control Board prohibited any further municipal water supply withdrawals in the James City County area. Hence, as the EPA was well aware, James City County by state prohibition could not even consider groundwater options.[11] For EPA to suggest further groundwater withdrawal (wells), which it

---

**10.** *Recommended Determination,* A.R. B–72 at 46.

**11.** Obviously, if the three dam project and increased groundwater use are not available to

James City County as separate entities, there is no alternative of using them in combination.

knows is prohibited by law, is also non-sense.

Other relevant alternatives suggested by the EPA were desalinization of brackish water and conservation. Desalinization, labelled by the Virginia Health Department as a "premature technology", is both logistically and fiscally prohibitive.[12]   Moreover, it is clear that conservation, while a laudable concept, certainly could not meet the increasing water needs of a county with an already unreliable water supply.

In sum, even if EPA's application of a presumption that there were alternatives to the Ware Creek Reservoir was proper, the record undoubtedly proves that no practicable alternatives are in fact available to James City County.   As this County is in desperate need of a reliable water supply, the Ware Creek Reservoir must be authorized.   Therefore, the Court finds that the Section 404(c) veto by the EPA was improper.

The Court hereby ORDERS that the Army Corps of Engineers issue a permit to place fill to James City County for the Ware Creek Reservoir.

12. *Administrative Record,* E–14.