955 F.2d 254
 22 Envtl. L. Rep. 20,566
 JAMES CITY COUNTY, VIRGINIA, Plaintiff-Appellee,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, United States
Army Corps of Engineers, Defendants-Appellants,
Southern Environmental Law Center, Virginia Wildlife
Federation, National Wildlife Federation,
Chesapeake Bay Foundation, Amici Curiae.
 No. 91-2612.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 1, 1991.
Decided Jan. 29, 1992.
 
 Martin William Matzen, U.S. Dept. of Justice, Washington, D.C., argued (Richard B. Stewart, Asst. Atty. Gen., Peter W. Colby, Edward J. Shawaker, U.S. Dept. of Justice, Washington, D.C., Henry E. Hudson, U.S. Atty., Susan L. Watt, Asst. U.S. Atty., Norfolk, Va., Caroline Wehling, Office of General Counsel, U.S. Environmental Protection Agency, Washington, D.C., on brief), for defendants-appellants.
 William B. Ellis, McSweeney, Burtch & Crump, P.C., Richmond, Va., argued (Michael V. Hernandez, McSweeney, Burtch & Crump, P.C., Richmond, Va., Frank M. Morton, III, County Atty., James City County, Williamsburg, Va., on brief), for plaintiff-appellee.
 William A. Butler, Patricia Ross McCubbin, Angus E. Crane, James W. Rubin, Dickstein, Shapiro & Morin, Washington, D.C., Roy Hoagland, Ann Powers, Chesapeake Bay Foundation, Inc., Richmond, Va., David W. Carr, Jr., Southern Environmental Law Center, Charlottesville, Va., David W. Carr, Jr., Jan Goldman-Carter, Virginia Wildlife Federation, Virginia Beach, Va., David W. Carr, Jr., Jan Goldman-Carter, National Wildlife Federation, Washington, D.C., for Amici Curiae.
 Before SPROUSE, Circuit Judge, SPENCER, District Judge for the Eastern District of Virginia, sitting by designation, and HERLONG, District Judge for the District of South Carolina, sitting by designation.
 OPINION
 SPROUSE, Circuit Judge:
 
 
 1
 We review a judgment of the district court overturning a determination by the Environmental Protection Agency (the "EPA") pursuant to section 404(c) of the Clean Water Act, 33 U.S.C. §§ 1251 et seq. 758 F.Supp. 348. The EPA vetoed a decision by the Army Corps of Engineers which would have permitted James City County, Virginia, to build a dam and construct a water reservoir on Ware Creek. We hold that the district court properly overturned the EPA's veto, but erred in failing to remand the case to the EPA for further proceedings.
 
 
 2
 * James City County lies next to the City of Williamsburg on the York-James Peninsula. Although the County contains no large cities, it is the second fastest growing county in Virginia and has many summer visitors. In 1981, the County had approximately 24,000 residents. By 1987, the County's population had grown to approximately 31,000 residents. Projections indicate that, by the year 2030, the County's population will grow to over 50,000.
 
 
 3
 The County's current population consumes 9.3 million gallons of water per day ("mgd") provided from three sources. The City of Newport News sells 5.4 mgd to residents in part of the County, groundwater wells within the County provide 3.6 mgd, and the remaining 0.3 mgd is purchased from the City of Williamsburg. The EPA, the Corps, and the County have accepted that, based on the County's projected future population, the County's water requirements for the year 2030 will be 18.2 mgd.
 
 
 4
 Several factors limit the County's ability to satisfy its increasing need for water with its current sources. Williamsburg refuses to supply water to the County after 1999. In addition, Newport News will not expand delivery beyond 7.7 mgd. The County also claims that its supply of groundwater is unreliable. It contends that levels of groundwater are falling, that the County's groundwater contains impurities in violation of the EPA standards under the Federal Safe Drinking Water Act, and that the groundwater has been called "adverse to public health, welfare, and safety" by the Virginia State Water Control Board (the "SWCB"). The County therefore contends that it must develop a new source of water which could supply 10.5 mgd, the amount of the County's projected demand in excess of the 7.7 mgd Newport News would supply.
 
 
 5
 After various water supply studies by federal, state, and private organizations, the County decided that the best way to meet the projected excess demand was to construct a reservoir by building a dam in Ware Creek. The resulting lake would extend into adjacent New Kent County, flooding 425 acres of wetlands, and would reliably yield approximately 9.4 mgd of water. This reservoir could also be connected to the Newport News water system. Because of the steep topography of the proposed reservoir site, connection with Newport News could double the reservoir's yield without inundating additional wetlands.
 
 
 6
 Before construction of the reservoir could begin, however, the County was required to first obtain a permit to place fill for the dam. See 33 U.S.C. § 1311(a). As developed in greater detail below, the Clean Water Act gives the Army Corps of Engineers primary responsibility for evaluating the County's application and issuing the appropriate permit, see Clean Water Act § 404(a), 33 U.S.C. § 1344(a), although the Act also authorizes the EPA to veto the Corps' decision under certain circumstances. See Clean Water Act § 404(c), 33 U.S.C. § 1344(c).
 
 
 7
 In 1984, the County formally applied to the Corps for a permit to place fill to construct the dam. The Corps, the United States Fish and Wildlife Service, the National Marine Fisheries Service, and the EPA jointly completed an Environmental Impact Statement in September 1987, and the Corps subsequently issued a notice of intent to issue the permit on July 11, 1988. The EPA's Regional Administrator then reviewed the Corps' decision.[1] After further hearings, comments, and consultations with the Corps, the Regional Administrator recommended on February 17, 1989, that the EPA veto the Corps' decision. This recommendation was referred to the national EPA Administrator in Washington, D.C., where, on July 10, 1989, the EPA's Assistant Administrator for Water issued the EPA's Final Determination, vetoing the Corps' decision to issue the permit.
 
 
 8
 The County then filed suit against the EPA and the Corps in the Eastern District of Virginia, challenging the EPA's veto. On November 6, 1990, the district court granted summary judgment to the County. The court overturned the EPA's veto, ordered the Corps to issue the permit, and denied the EPA's request for a remand to the EPA for further proceedings. The EPA subsequently filed this appeal.
 
 
 9
 The complex statutory and regulatory scheme involved here requires some preliminary discussion. Section 404(a) of the Clean Water Act gives the Army Corps of Engineers primary responsibility for issuing the permit required by the County. It states that "The Secretary [of the Army, acting through the Corps of Engineers,] may issue permits, after notice and opportunity for public hearings[,] for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a).
 
 
 10
 While the Clean Water Act contains no particular provision detailing the standards to be used by the Corps in determining whether to issue a permit, it contains instructions for the Corps to follow in "specifying" sites where dredged or fill material may be placed. Section 404(b) of the Clean Water Act states:
 
 
 11
 Subject to subsection (c) of this section, each such disposal site shall be specified for each such permit by the Secretary
 
 
 12
 (1) through the application of guidelines developed by the Administrator, in conjunction with the Secretary, which guidelines shall be based upon criteria comparable to the criteria applicable to the territorial seas, the contiguous zone, and the ocean under section 1343(c) of this title....
 
 
 13
 33 U.S.C. § 1344(b).
 
 
 14
 Pursuant to this mandate, the EPA and the Corps have jointly issued guidelines to be followed by both agencies in making their respective determinations under section 404. See 40 C.F.R. § 230 (1991). These guidelines state that a permit should not be issued if: (1) practicable, environmentally superior alternatives are available, (2) the discharge would result in a violation of various environmental laws, (3) the discharge would result in significant degradation to the waters of the United States, or (4) appropriate and practicable steps have not been taken to minimize potential adverse impacts of the proposed discharge. 40 C.F.R. § 230.10(a)-(d).
 
 
 15
 In deciding to issue the permit, the Corps found that the project did not violate any of these provisions. It found specifically that there were no practicable, environmentally superior alternatives to the Ware Creek Reservoir. It also found that the proposed reservoir would not cause or contribute to violations of water quality or toxic effluent standards, that it would not affect any threatened or endangered species or marine sanctuaries, that the project would not cause or contribute to significant degradation of waters of the United States, and that the County had made all appropriate and practicable efforts to minimize potential adverse effects.
 
 
 16
 As noted above, however, approval by the Corps is not the end of the permit process. Section 404(c) of the statute authorizes the EPA to veto a Corps' decision to issue a permit when the EPA Administrator "determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." 33 U.S.C. § 1344(c) (emphasis added). It requires the Administrator to consult with the Corps before making a final determination and to "set forth in writing and make public his findings and his reasons for making any determination under this subsection." Id.
 
 
 17
 In the regulations the EPA has issued to govern its veto determinations, "unacceptable adverse effect" is defined as an "impact on an aquatic or wetland ecosystem which is likely to result in significant degradation of municipal water supplies (including surface or ground water) or significant loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas." 40 C.F.R. § 231.2(e). This regulation also provides that, "In evaluating the unacceptability of such impacts, consideration should be given to the relevant portions of the section 404(b)(1) guidelines...." Id.
 
 
 18
 The Regional Administrator conducts the first step in the EPA veto process. After the Corps published its notice of intent to issue the permit, the Regional Administrator in this case issued a Proposed Determination which would veto the Corps' decision. After holding a hearing, the Regional Administrator issued a Recommended Determination that the EPA veto the Corps' decision. The decision included findings that viable alternative water supplies were available to the County. These alternatives included a possible pipeline to the County from the James River, conservation, use of additional groundwater (including desalinized groundwater), and the construction of three smaller dams on a different site on Ware Creek.[2]
 
 
 19
 The Recommended Determination was then referred to the national EPA Administrator, who delegated his final decisionmaking authority to the Assistant Administrator for Water. On July 10, 1989, the Assistant Administrator for Water issued the EPA's Final Determination to veto the permit. In deciding to veto the Corps' decision, the Final Determination found that the proposed Ware Creek Reservoir
 
 
 20
 would result in a severe direct and cumulative loss of wildlife habitat and would result in serious impacts to and/or losses of involved wildlife species. In addition, the record reveals that there are practicable, less environmentally damaging alternatives that are available to James City County that would provide sufficient water supplies for its projected local needs. EPA therefore concludes that construction of the proposed Ware Creek impoundment would result in unacceptable adverse effects to wildlife.
 
 
 21
 Like the Regional Administrator's Recommended Determination, the Final Determination included findings that alternative sources of water were available to the County. Although the Final Determination rejected the James River pipeline as an alternative, it endorsed the three dam project, groundwater, desalinization, and conservation as alternative sources of water for the County.
 
 
 22
 In contrast to the Recommended Determination, the Final Determination explicitly stated that the three dam project was a viable alternative water source for the County. It also concluded that groundwater could supply an amount between current production of 3.6 mgd and 9.4 mgd, although it noted that, if the SWCB limited use of groundwater, such a decision would preclude consideration of groundwater as an alternative. The EPA also concluded that there was insufficient evidence in the record to exclude desalinization as an option, and adopted a section of the Recommended Determination which mentioned favorably a Southern Environmental Law Center claim that conservation could reduce the County's demand for water by eighteen to twenty percent. Finally, the Assistant Administrator emphasized the possibility of meeting the County's water requirements through a combination of alternatives or through a regional solution.[3]
 
 
 23
 After the EPA issued its Final Determination, the County brought this action in the district court under 5 U.S.C. § 702, as well as 28 U.S.C. §§ 1331 and 2201, seeking to overturn the EPA's action. The district court granted summary judgment to the County, finding that the County had no practicable alternatives to the construction of the Ware Creek Reservoir and that the EPA had incorrectly presumed that alternatives existed. After holding that the EPA's veto was improper, the district court ordered the Corps to issue the permit and rejected the EPA's request for a remand.
 
 II
 
 24
 While the EPA does not abandon its challenge to the district court's finding that the County had no practicable alternatives to the construction of the dam, its primary claim on appeal is that the district court should have remanded the case to the EPA in order to provide the EPA with an opportunity to consider whether the project's environmental effects alone justified a veto. The EPA also requests an opportunity to reassess whether practicable alternatives are available.[4] In response, the County argues that this case should not be remanded to the EPA. It maintains that practicable alternatives are unavailable and that the EPA has already refused to veto the project on environmental effects alone. The County argues in the alternative that the EPA has waived its right to another veto determination.
 
 
 25
 We first consider whether the district court properly concluded that there were no practicable alternatives to the proposed reservoir. We find no error in that decision of the district court. However, because we do not believe that the EPA has in fact decided not to veto the permit even in the absence of practicable alternatives, we find that the district court should have remanded this issue to the EPA for its further consideration.
 
 
 26
 * In our review of the district court's conclusion that there were no practicable alternatives, we are guided by the same standards that controlled the district court's evaluation of the EPA's Final Determination. The Administrative Procedures Act provides that when a court reviews an administrative agency's action on the record of a hearing provided by statute, that action can only be set aside if it is "unsupported by substantial evidence." 5 U.S.C. § 706(2)(E).[5] Since, in our view, the EPA's finding that the County had practicable alternative water sources was not supported by substantial evidence, we affirm the district court's holding in this respect.
 
 
 27
 The guideline regarding alternatives states:
 
 
 28
 Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences.
 
 
 29
 40 C.F.R. § 230.10(a). The regulation provides further that "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2).
 
 
 30
 The three dam project is the primary alternative suggested by the EPA in its Final Determination. As the EPA recognized, however, part of the three dam project would be built in New Kent County. The record demonstrates that New Kent County categorically opposes the project and will not consent to its construction. Moreover, the three dam project also requires a section 404 permit, but the EPA did not find that the County could obtain a permit for the project. In fact, various statements by the EPA in the record indicate that the EPA itself would likely veto a permit for the three dam project. Finally, water from the three dam project would cost fifty percent more than water from the proposed reservoir. We are persuaded, therefore, that the three dam project is not a practicable alternative for the County.
 
 
 31
 Nor is groundwater a practicable alternative. In the Final Determination, the EPA itself recognized that groundwater would not be a practicable alternative if further groundwater withdrawals were prohibited by the SWCB. The SWCB has in fact prohibited further groundwater withdrawals in response to a study by the United States Geological Survey.
 
 
 32
 We also believe the EPA erred by including desalinization as a viable alternative. Desalinization, briefly mentioned in the Final Determination, is still experimental. This technique also has adverse environmental effects--the County would have to dispose of the salt removed from the water. There is simply no evidence that desalinization could provide a substantial and reliable source of water for the County.
 
 
 33
 Conservation, of course, may be considered in determining the County's water supply needs. However, accepting arguendo the Southern Environmental Law Center's largest estimate--that conservation could decrease the County's demand for water by twenty percent--a substantial water supply deficit would remain.
 
 
 34
 Despite uncontroverted evidence to the contrary, the EPA found that the County had practicable water supply alternatives. We conclude that, giving the appropriate deference to the agency, there was not substantial evidence to support the EPA's conclusion that the County had practicable alternatives.[6] Since we feel that the record makes this conclusion unavoidable, on remand the EPA will not be permitted to revisit this issue.
 
 B
 
 35
 The County concedes, as it must, that remands are generally appropriate when a court finds that the stated basis for an agency's action is inadequate. See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, 435 U.S. 519, 524-25, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978). It argues, however, that a remand is not appropriate in this case for several reasons.
 
 
 36
 First, it claims that the Recommended Determination essentially suggested to the national office that the EPA veto the project based on adverse effects alone. It argues further that EPA's treatment of the Recommended Determination--modifying it so as to veto based on the availability of alternatives--amounted to a finding that the adverse environmental effects of the project alone did not justify a veto. We disagree. Both the Recommended and the Final Determinations found that practicable alternatives were available. The Recommended Determination simply stated that the permit should be vetoed because of "unacceptable adverse effects," merely repeating the holding required by statute to justify a veto. We do not read the Recommended Determination to suggest that the EPA should veto even in the absence of practicable alternatives. In our view, the EPA has not yet ruled that considerations of environmental effects would alone justify a veto. It should have that opportunity.
 
 
 37
 The County also contends that the EPA's veto rights under the statute provide merely a single "opportunity" to veto, which, when exercised improperly, is waived. While theoretically Congress could create a scheme providing an agency with only one opportunity to make such a determination, we do not discern a congressional intent to implant that radical procedure in section 404(c). Accordingly, we reject the argument that the EPA has waived its right to veto the permit based on adverse effects alone.
 
 
 38
 Finally, the County argues that the EPA's delay in acting, as well as the prejudice the County will suffer as a result of a remand and further delay, justify the decision of the district court not to remand. We recognize that when Congress enacted section 404, it was concerned about the possibility of harmful delays in permit and veto decisions. See 118 Cong. Rec. 533699 (remarks of Sen. Muskie) ("The Conferees expect the Administrator to be expeditious in his determinations as to whether a site is acceptable...."). In this context, our decision to remand was heavily influenced by the unequivocal representation of the EPA's counsel at oral argument that the EPA could complete its determination on remand within sixty days of our decision. We would view seriously any failure to comply with that representation.
 
 
 39
 In view of the above, the judgment of the district court is affirmed in part. The case is, however, remanded to the district court for further remand to the EPA for action consistent with the views expressed in this opinion.
 
 
 40
 AFFIRMED IN PART AND REMANDED.
 
 
 
 [1]
 For procedures established and followed by EPA in making its section 404(c) determinations, see 40 C.F.R. § 231
 
 
 [2]
 The Recommended Determination equivocated with regard to the three dam alternative. It stated that "[w]e believe that this option continues to present serious environmental consequences. However, in the context of impact minimization[,] the three dam option should have received more attention."
 
 
 [3]
 Although the EPA vetoed the permit, the Final Determination only vetoed the project as a local water supply source. The EPA apparently reserved the right to permit the reservoir as a regional water source
 
 
 [4]
 By contrast, the Southern Environmental Law Center, the National Wildlife Federation, the Virginia Wildlife Federation, and the Chesapeake Bay Foundation, filing a brief as amici curiae, asked this court to reverse the district court and affirm EPA's decision, either because EPA correctly concluded that practicable alternatives exist, or because EPA has already held that the adverse environmental effects alone were sufficient to justify a veto. Our focus, of course, is on the relief requested by EPA, not the amici. We note, however, that our reasoning obviously rejects these arguments
 
 
 [5]
 In our view, this is the proper standard of review for the EPA's section 404(c) determination, in light of the statutory requirements of notice and opportunity for public hearings, as well as the requirement that "The Administrator shall set forth in writing and make public his findings and his reasons for making any determination under this subsection." 33 U.S.C. § 1344(c). But see Bersani v. Robichaud, 850 F.2d 36, 46 (2d Cir.1988), cert. denied, 489 U.S. 1089, 109 S.Ct. 1556, 103 L.Ed.2d 859 (1989) (reviewing a section 404(c) veto decision by the EPA under the arbitrary and capricious standard). Even were we to review EPA's action under the "arbitrary and capricious" standard, however, we would reach the same conclusions that we reach herein
 
 
 [6]
 The district court concluded that EPA had relied upon a presumption that practicable alternatives exist because of a mistaken belief that the proposed reservoir would "not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e., is not 'water dependent')...." 40 C.F.R. § 230.10(a)(3). After reviewing the EPA's Final Determination, we are not persuaded that EPA applied the presumption in this case. While parts of the Final Determination seem to require the County to prove that alternatives are not available, EPA makes its findings without explicitly invoking the presumption. Moreover, like the district court, we are persuaded that this project is water dependent, and conclude that the presumption does not apply