**JAMES CITY COUNTY, VIRGINIA,**
**Plaintiff–Appellee,**

v.

**ENVIRONMENTAL PROTECTION AGENCY; United States Army Corps of Engineers, Defendants–Appellants.**

**Southern Environmental Law Center; Virginia Wildlife Federation; National Wildlife Federation; Chesapeake Bay Foundation, Amici Curiae.**

No. 92–2294.

United States Court of Appeals,
Fourth Circuit.

Argued June 10, 1993.

Decided Dec. 30, 1993.

Martin William Matzen, U.S. Dept. of Justice, Washington, DC, argued (Vicki A. O'Meara, Acting Asst. Atty. Gen., David A. Carson, Edward J. Shawaker, U.S. Dept. of Justice, Washington, DC, Richard Cullen, U.S. Atty., Alexandria, VA, Susan L. Watt, Asst. U.S. Atty., Norfolk, VA, Caroline Wehling, Office of Gen. Counsel, U.S.E.P.A., Washington, DC, on brief), for defendants-appellants.

Donald A. Carr, Winthrop, Stimson, Putnam & Roberts, Washington, DC, argued (William L. Thomas, Winthrop, Stimson, Putnam & Roberts, Washington, DC, Ann Powers, Vice President & Gen. Counsel, Chesapeake Bay Foundation, Inc., Annapolis, MD, Roy A. Hoagland, Virginia Staff Atty., on brief), for amicus curiae Chesapeake Bay Foundation.

William B. Ellis, McSweeney, Burtch & Crump, P.C., Richmond, VA, argued (Frank M. Morton, III, James City County, Williamsburg, VA, on brief), for plaintiff-appellee.

Nicholas C. Yost, Angus E. Crane, Dickstein, Shapiro & Morin, Washington, DC, David W. Carr, Jr., Southern Environmental Law Center, Charlottesville, VA, Apphia T. Schley, Nat. Wildlife Federation, Washington, DC, Apphia T. Schley, Virginia Wildlife Federation, Cobham, VA, for amici curiae Southern Environmental Law Center, et al.

Before RUSSELL, Circuit Judge, SPROUSE, Senior Circuit Judge, and BRITT, United States District Judge for the Eastern District of North Carolina, sitting by designation.

## OPINION

SPROUSE, Senior Circuit Judge:

The United States Army Corps of Engineers in 1988 granted a permit under section 404(b) of the Clean Water Act, 33 U.S.C. §§ 1251–1387, to James City County, Virginia, to construct a dam and reservoir across

Ware Creek located within the County. The Environmental Protection Agency ("EPA") "vetoed" the permit under the authority granted it by section 404(c) of the Clean Water Act, 33 U.S.C. § 1344(c). After the County contested that action in the district court, the court granted it summary judgment and ordered the Corps of Engineers to issue the permit. *James City County v. EPA,* 758 F.Supp. 348 (E.D.Va.1990). In a previous appeal, we affirmed the district court's holding that there was not substantial evidence to support the EPA's finding in its final determination that the County had practicable alternatives to building the Ware Creek reservoir for its local water supply, but remanded to the EPA to afford it the opportunity to decide whether environmental considerations alone would justify its veto. *James City County v. EPA,* 955 F.2d 254 (4th Cir.1992) ("*JCC I* "). We instructed the EPA not to revisit the issue of practicable alternatives.

On remand, the EPA considered its administrative record and again vetoed the § 404(b) permit—basing its veto solely on environmental considerations. The County again brought an action in the district court, which again granted summary judgment and ordered issuance of the permit. *James City County v. EPA,* No. 89 156–NN, 1992 WL 315199 (E.D.Va.1992). The EPA now appeals that judgment to this court. We reverse.

We consider the same facts which we considered in *JCC I* but in the context of the issues framed by the EPA's new final determination and the district court's decision after remand. No purpose will be served by repeating the area's detailed water needs discussed in our earlier opinion. Suffice it to say that the present water supplies for all of the political entities in Virginia's Lower Peninsula are rapidly becoming inadequate. Plans for development of the Ware Creek reservoir designed as a project to supply only the needs of James City County have been underway since at least 1982. We discussed in *JCC I* the statutory and regulatory frame controlling the issuance of the involved permit. The issues presented to us in this second appeal, however, come in a somewhat unusual posture so it will be useful to again review the statute and regulations which guide our considerations.

## I

The stated objective of the Clean Water Act is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). A review of the statute and legislative history reflects that Congress' intention in enacting the Clean Water Act was focusing on remedying the cumulative industrial and institutional practices that have spoiled much of the Nation's waters, and its concern was assuring high quality in our waters. *See* S.Conf. Rep. No. 1236, 92d Cong., 2d Sess. 99–100 (1972), 1972 U.S.Code Cong. & Admin.News 3668 (conference report explaining that in § 101 of the Clean Water Act, 33 U.S.C. § 1251, congressional intent was to eliminate pollutant discharge, restore chemical, physical, and biological integrity of the Nation's waters, set water quality goals, prohibit toxic discharges, and develop waste treatment projects and plans), *reprinted in* 1 *Legislative History of the Federal Water Pollution Control Act Amendments of 1972,* at 282–83 (1973).

This comprehensive act covers the broad spectrum of pollution caused by our varied and complex way of life. Specific provisions cover building and operation of treatment plants directed to process wastewater from industrial facilities, toxic pollution, many varieties of nontoxic pollution, and the like. *See, e.g.,* 33 U.S.C. §§ 1281–1299 (construction of waste treatment facilities); 33 U.S.C. § 1311 (effluent limitations); 33 U.S.C. § 1317 (1988) (toxic and pretreatment effluent standards); 33 U.S.C. § 1321 (oil and hazardous substance liability); 33 U.S.C. § 1322 (marine sanitation devices). Section 404 of the Act, 33 U.S.C. § 1344, relates narrowly to the placement of dredged or fill material into the Nation's waters. It is this section which covers the issuance of permits for the construction of reservoirs by damming streams, and it is the statutory provision upon which this appeal is centered. It provides, in relevant part:

**§ 1344 Permits for dredged or fill material**

**(a) Discharge into navigable waters at specified disposal sites**

The Secretary [of the Army or the Corps of Engineers] may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites....

**(b) Specification for disposal sites**

Subject to subsection (c) of this section, each such disposal site shall be specified for each such permit by the Secretary (1) through the application of guidelines developed by the Administrator [of the EPA], in conjunction with the Secretary....

**(c) Denial or restriction of use of defined areas as disposal sites**

The Administrator [of the EPA] is authorized to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas. Before making such determination, the Administrator shall consult with the Secretary. The Administrator shall set forth in writing and make public his findings and his reasons for making any determination under this subsection.

Pursuant to the mandate of section 404(b), the EPA and the Corps have jointly issued guidelines to be followed by both agencies in making their respective determinations under section 404. *See* 40 C.F.R. § 230. These guidelines state that a permit should not be issued if:

(1) practicable, environmentally superior alternatives are available, (2) the discharge would result in a violation of various environmental laws, (3) the discharge would result in significant degradation to the waters of the United States, or (4) appropriate and practicable steps have not been taken to minimize potential adverse impacts of the proposed discharge.

*JCC I*, 955 F.2d at 257 (summarizing 40 C.F.R. § 230.10(a)–(d)).

In addition to the guidelines issued jointly by the EPA and the Corps of Engineers, the EPA has issued regulations, which, among other things, define "unacceptable adverse effect" as "impact on an aquatic or wetland ecosystem which is likely to result in significant degradation of municipal water supplies (including surface or ground water) or significant loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas." 40 C.F.R. § 231.2(e). These regulations also provide that "[i]n evaluating the unacceptability of such impacts, consideration should be given to the relevant portions of the section 404(b)(1) guidelines." *Id.*

In *JCC I*, the County applied for and the Corps of Engineers granted the permit at issue in this appeal. The permit would allow the construction of a water reservoir by the erection of a dam across Ware Creek, a tributary of the York River, which, in turn, flows into the Chesapeake Bay. In its final determination of whether to veto the permit, the EPA discussed in detail its opinion that construction of the dam would have "unacceptable adverse effects" on municipal water supplies, fish, wildlife, and recreational areas such as are prohibited by section 404(c) of the Act, 33 U.S.C. § 1344(c). It determined, among other things, that the construction would have a damaging impact on environmental contributions to the York River and to the Chesapeake Bay. In its conclusion to its first final determination, however, the EPA added a statement that resulted in the district court ruling against it in the first action:

[i]n addition, the record reveals that there are practicable, less environmentally damaging alternatives that are available to James City County that would provide sufficient water supplies for its projected local needs. EPA therefore concludes that construction of the proposed Ware Creek im-

poundment would result in unacceptable adverse effects to wildlife.

In *JCC I*, the district court concluded that the EPA's finding of unacceptable adverse effects was based on its factual conclusion that there were practical alternatives for the County's water needs that would be "less environmentally damaging." It found that there was no evidence to support a finding that practical alternatives were available to the County and, in effect, overturned the EPA's veto—ordering the County to issue the permit. On appeal, we agreed with the district court that the EPA's finding of local practical alternatives was not adequately supported by the record and affirmed that part of the district court's opinion. The EPA's primary argument in the first appeal, however, was that the district court should have remanded the case to it so that it could consider and clearly articulate whether the project's environmental effects alone justified a veto. We agreed, affirming in part, but remanding to afford the agency the opportunity for the further consideration it sought. *Id. See Vermont Yankee Nuclear Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 524–25, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978). Since we felt that the record conclusively showed that there were not practical alternatives to the Ware Creek project as a *local* project and that the EPA had full opportunity to develop that issue, we instructed the EPA not to "revisit" it.

The EPA, in the initial determination considered in *JCC I*, had dwelled for considerable lengths both on the supply and environmental advantages of a regional water supply as opposed to the Ware Creek project which was designed to supply, at most, the water needs of two small counties. It also discussed the obstacles to a regional system posed by the lack of cooperation between the affected communities in Virginia's Lower Peninsula, and between the State of Virginia and the communities. The EPA made clear its position that it would consider differently a regional Ware Creek project or a regional project for impounding the water of other streams in the area.[1]

The EPA read our instructions in *JCC I* rather narrowly. Although we instructed the agency not to revisit the issue of practical alternatives, this was related to the alternatives discussed in the first determination and was based on our view that an agency failing to meet its evidentiary burden in these circumstances was not entitled to a "second bite of the apple." In any event, in this appeal, we are faced with a somewhat different problem than the one presented in the first appeal. In its Final Determination After Remand, the EPA, of the view that our remand required it, deleted the discussion of a putative regional water supply and concluded that its veto was justified solely on the basis of unacceptable adverse effects on the environ-

1. After James City County began developing its plan for Ware Creek, parallel and competing plans were crafted for a regional water supply system to service virtually all of the Lower Peninsula region, including James City County. No single regional plan has advanced to a permitting stage, so none has been considered formally by the EPA. The County, however, complained on appeal in *JCC I* and repeats its complaint in this appeal, that the EPA's veto was an attempt to coerce it into accepting water from a yet-to-be designed regional water source.

Whether the region's future water needs will be met through regional or local supplies has been a source of controversy in the Lower Peninsula. There is considerable comment in the administrative record to the effect that while James City County prefers the local approach it now pursues, other political entities in the area prefer the regional approach. Since 1987, for example, when representatives from Newport News, Williamsburg, and York County formed the Regional Raw Water Study Group (RRWSG), local governments have analyzed options for constructing facilities to supply water to the entire region. Although James City County initially declined to participate in this study group, it joined after the EPA first vetoed the Ware Creek project, apparently showing a willingness to consider a regional approach despite its preference for a local solution to its water needs.

RRWSG has narrowed its focus to three reservoir proposals—a Black Creek Reservoir, a King William Reservoir, and an expanded Ware Creek Reservoir. Record material presented by the group's representatives indicates that the King William and Black Creek proposals would produce considerably more water at less environmental cost than would the Ware Creek Reservoir. Although the EPA has denied expressing a preference, the amici in this appeal urge that one regional dam chosen from these alternatives would provide considerably more water with much less adverse environmental consequences than parallel local ones.

ment. The district court, in ruling for the County, held that the EPA lacked the authority to base its veto solely on the grounds of adverse effects to the environment. It opined that the agency must consider the County's need for water. Alternatively, the district court ruled that there was not sufficient evidence to support the EPA's conclusion of unacceptable adverse environmental effects.

■ It may have been better had the EPA discussed the County's need for water and its earlier articulated opinion that the controversy was not so much about the need for water as the way in which it was to be provided, i.e., by local or regional approach. We are constrained, however, by the familiar principle of *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947), that the propriety of an agency's action can only be judged on the grounds on which it rests its actions. We are presented then with the chore of determining whether the EPA has the authority to justify its § 404(c) veto in this case solely on the basis that it would cause unacceptable adverse effects on the environment. Although we find no precedent and little legislative history, we are persuaded by the structure and language of the Act that it has that authority.

## II

The district court, in ruling that the EPA erred in not discussing the County's need for water, cited 40 C.F.R. § 231.1(a) which defines the "purpose and scope" of Part 231 relating to procedures and directs that the EPA consider "all information available to [it]."

On appeal, the County does not rely primarily on the district court's reasoning, but argues that the EPA derives its authority to consider the County's water needs from statutory language. It focuses on the key proscriptive phrase used by Congress "unacceptable adverse effects" and urges that the EPA is required to consider a wide range of factors in determining what is "unacceptable." It points out that the EPA's position in other litigation has been grounded on this same argument. The EPA, in reply, asserts that while it may in its sole discretion consid-

er the need for water, the only requirement placed on it by Congress is to consider the project's potential adverse impacts on the environment. In support of its argument, the agency points to the preamble to 40 C.F.R. Part 231:

> [S]ection 404(c) does not require a balancing of environmental benefits against non-environmental costs such as the benefits of the foregone project. This view is based on the language of 404(c) which refers only to environmental factors. The term "unacceptable" in EPA's view refers to the significance of the adverse effect—e.g. is it a large impact and is it one that the aquatic and wetland ecosystem cannot afford.
>
> ... [E]ven when there is no alternative available, and "vetoing" the site means stopping a project entirely, the loss of the 404(c) resource may still be so great as to be "unacceptable."

44 Fed.Reg. 58,076, 58,078 (Oct. 9, 1979).

The County does not seriously contest the EPA's interpretation negating a cost/benefit analysis. It forcefully contends, however, that before imposing a veto some consideration must be given to a community's need for water and emphasizes that this does not require a cost/benefit analysis. It correctly points out that in *JCC I*, relying on the legislative history of the Clean Water Act and the preamble to its own regulations implementing that act, the EPA took the position in the district court that "the 'acceptability' of adverse [environmental] effects can best be evaluated in light of all relevant factors, including such concerns as the availability of alternatives." The EPA asserted that this had been a long-standing agency policy.

Congress obviously intended the Corps of Engineers in the initial permitting process to consider the total range of factors bearing on the necessity or desirability of building a dam in the Nation's waters, including whether the project was in the public interest. For example, as stated earlier, under 40 C.F.R. § 230.10, in deciding whether to issue a permit, the Corps takes into account the availability of practicable alternatives to the proposed project, whether the proposed dis-

charge would violate environmental laws or significantly degrade national waters, and whether adequate measures are taken to minimize harmful effects. In addition to these environmentally-based criteria, the Corps conducts a "public interest review" which, inter alia, takes into account the public and private need for the project, whether the same result could be achieved through other means, and the "extent and permanence" of the benefits and harms the proposed project is likely to produce. 33 C.F.R. § 320.4(a). Ultimately, however, recognizing the EPA's expertise and concentrated concern with environmental matters, Congress gave the final decision whether to permit a project to that agency. Its authority to veto to protect the environment is practically unadorned. It is simply directed to veto when it finds that the discharge "will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." *See* 118 Cong. Rec. 33,699 (1972) (senate debate explaining that under § 404 EPA should not issue a permit if project will adversely affect the listed resources), *reprinted in* 1 *Legislative History of the Federal Water Pollution Control Act Amendments of 1972*, at 177 (1973); *see also* S.Conf.Rep. No. 1236, 92d Cong., 2d Sess. 142 (1972) (conference committee report explaining that § 404 grants EPA the power to veto project that will adversely affect the listed resources), *reprinted in* 1 *Legislative History of the Federal Water Pollution Control Act Amendments of 1972*, at 325 (1973). This broad grant of power to the EPA focuses only on the agency's assigned function of assuring pure water and is consistent with the missions assigned to it throughout the Clean Water Act.

We think it significant that the only mention of responsibility for the quantities of water available to communities is contained in section 101(g) entitled "Authority of States over water" which states:

It is the policy of Congress that the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired by this chapter. It is the further policy of Congress that nothing in this chapter shall be construed to supersede or abrogate rights to quantities of water which have been established by any State. Federal agencies shall co-operate with State and local agencies to develop comprehensive solutions to prevent, reduce and eliminate pollution in concert with programs for managing water resources.

33 U.S.C. § 1251(g).

In our view, the EPA's only function relating to the quantities of available water is limited to assuring purity in whatever quantities the state and local agencies provide. For these reasons, we think its veto based solely on environmental harms was proper.

### III

Having found that, in this case, the EPA could consider whether adverse environmental effects alone justified a veto, we now review the district court's alternate holding that the factual conclusion of unacceptable adverse effects was not supported by the record. In its Final Determination After Remand, the EPA analyzed the proposed project's adverse impacts on wildlife, recreational and commercial fisheries, and recreation in the Ware Creek watershed, as well as the project's impacts outside of the general vicinity. The agency also considered James City County's mitigation plan. It then concluded that the adverse environmental effects of the project were unacceptable and reasserted its earlier veto.

The EPA noted that construction of the reservoir would result in the loss of 381 acres of vegetated wetlands, forty-four acres of palustrine (related to marshes), estuarine (related to estuaries), or lacustrine (related to lakes) open water systems, and 792 acres of adjacent forested uplands habitat. Some of the short-term effects of the construction of the project would be the loss of small animals and invertebrates that could not escape the construction site and the destruction of over half the vegetated wetland cover-type habitat. Reptile and amphibian populations in the watershed would be harmed by the destruction of overall habitat and particularly breeding habitat. The EPA also found that by blocking the Ware Creek's flow, the pro-

ject "would severely and adversely alter the current nutrient regime," which transports organic material into the York River and ultimately into the Chesapeake Bay. In discussing the cumulative adverse environmental impact on the Bay to which the Ware Creek project would contribute, the EPA noted "[t]he incremental loss of functional wetland systems which currently contribute to the environmental well-being of the York River and the Chesapeake Bay and which help maintain and protect the environmental integrity of those systems represents a profound cumulative loss."

Although the EPA recognized that the proposed reservoir would increase greatly the freshwater habitat, the agency found that the dam would harm fish species currently living in the Ware Creek watershed because it would convert the vegetated flowing stream system into a lake, possibly resulting in the eventual elimination of some stream species of fish. Also, the likely introduction of forage and game fish into the reservoir by the Virginia Department of Game and Inland Fisheries could alter the abundance and diversity of the current fish populations. Furthermore, construction of the dam, in the EPA's view, would destroy a valuable Great Blue Heron rookery and would eliminate favorable habitat for foraging species such as the Black Duck.

■ The EPA considered and discussed the County's mitigation plan. The plan includes wetlands creation, wetlands and uplands preservation, creation of potential Great Blue Heron nesting sites in Ware Creek (within the York River watershed), and removal of an existing dam in another watershed. Based on its review of the administrative record, however, the EPA concluded that the proposed mitigation plan would not adequately offset the adverse effects resulting from the local project. For instance, the more than 1600 acres marked for preservation are in another watershed and, for that matter, are already subject to EPA protection. The EPA also considered that less than fifty percent of the vegetated wetlands would be replaced by newly-created wetlands, even if the plan is completely successful.[2] Moreover, the EPA found that the mitigation plan would not adequately replace the types and qualities of wetlands the proposed project would destroy.[3] The lack of knowledge about the habitat needs of the Great Blue Heron also led the agency to decide that it could not assume that the mitigation efforts for the rookery would be successful. Accordingly, the EPA reached the following conclusions about James City County's mitigation plan:

> Upon reevaluation of the administrative record, EPA finds that the mitigation plan as proposed by James City County does not adequately offset adverse impacts to aquatic resources resulting from project implementation. EPA finds that the post-project reservoir system in conjunction with preservation and compensatory mitigation efforts proposed by the County would not adequately replace or compensate for the loss of or impacts to aquatic resource functions and values associated with the current Ware Creek wetlands and aquatic ecosystem. EPA therefore concludes that the mitigation proposed by James City County does not render the project acceptable under Section 404(c).

In the district court, the County contended and the district court held that the environmental data in the administrative record failed to provide substantial support for the EPA's position.[4] The court held primarily

---

**2.** The EPA generally grants mitigation credit only in exceptional circumstances and where the mitigation is undertaken in the same watershed.

**3.** As amici explain, different types of wetlands serve different functions, such as providing habitat or filtration or recharging aquifers.

**4.** Following our holding in *JCC I*, the district court applied the substantial evidence standard of review. On this appeal, the EPA asks us to reconsider our holding that we review the EPA's

§ 404(c) veto decision under that standard. As we stated in *JCC I*, the choice of review standard does not effect our decision on the merits because EPA's determination satisfies both the substantial evidence and arbitrary and capricious standards. The same is true on this appeal.

On mature reconsideration, however, we conclude that agency action under § 404 is reviewable under the arbitrary and capricious standard. Under 5 U.S.C. § 706(2)(E), the substantial evidence standard applies to cases "reviewed on the record of an agency hearing provided by stat-

that the agency failed to consider the County's mitigation plan to limit environmental damage. It held that the agency miscalculated the net loss of wetlands and the harm to fish and wildlife, and disregarded the inevitable development of the area around Ware Creek, with or without the proposed project. In our view the district court erred in failing to recognize the deference due the EPA's determination.

The court disputed the EPA's calculation of projected wetlands loss from the proposed project,[5] finding that after reducing the projected lost wetlands acreage by the number of wetlands acres to be created by the dam and the breaching of a dam in another watershed, and giving credit for mitigation efforts, the net loss was "almost zero." In doing so, the court disregarded the EPA's technical expertise and calculated the wetlands re-

placement based on raw numbers. However, as discussed above, the EPA took into account whether the replacement wetlands were of the same value and quality as the lost wetlands. The district court also faulted the agency for failing to accord "mitigation credit" for the 1600 + acres set aside for protection in another watershed. The agency's action, however, was consistent with its policy of applying mitigation credit in exceptional circumstances and in the same watershed.

The district court noted that the project would increase habitat for freshwater fish, that the mitigation plan would breach a dam in another watershed thereby benefiting anadramous fish, and that the dislocation of the Great Blue Heron and other migratory birds would be only temporary because they could find new rookery areas. Although EPA con-

ute." Examining the language of § 404(c) under this requirement, it is apparent that the EPA's determination is not required to be made on the record of a hearing, but rather must be made "after notice and opportunity for public hearings." 33 U.S.C. § 1344(c). Our conclusion that § 706(2)(E) does not apply to § 404(c) determinations is supported by dicta in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), where the Supreme Court stated that the substantial evidence review standard applies only to agency rulemaking "or when the agency action is based on a public adjudicatory hearing." *Id.* at 414, 91 S.Ct. at 822. In applying the arbitrary and capricious standard of review, we apply the same standard used by other circuits reviewing § 404 actions. *See Bersani v. Robichaud*, 850 F.2d 36, 46 (2d Cir.1988), *cert. denied*, 489 U.S. 1089, 109 S.Ct. 1556, 103 L.Ed.2d 859 (applying arbitrary and capricious standard to EPA's § 404(c) determination). *See also Town of Norfolk v. United States Army Corps of Engineers*, 968 F.2d 1438, 1445 (1st Cir.1992) (reviewing Corps' § 404 permit decision under arbitrary and capricious standard); *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1521 (10th Cir.1992) (same); *Sierra Club v. United States Army Corps of Engineers*, 701 F.2d 1011, 1032 (2d Cir.1983) (same).

The Supreme Court explained the arbitrary and capricious review standard in *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983):

The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and

the choice made." ... In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." ... Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for this decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* at 43, 103 S.Ct. at 2866 (citations omitted). Under the substantial evidence standard, an agency ruling must be upheld if there is substantial evidence to support it. "Substantial evidence is 'such evidence as a reasonable mind might accept as adequate to support a conclusion.' ... While this Court must review the entire record, we may neither redetermine the facts nor substitute our own judgment for that of the [agency]." *Harris v. Director, Office of Workers' Compensation Programs*, 3 F.3d 103, 106 (4th Cir.1993). It is widely held that there is now little difference in the application of the two standards. *See* Kenneth Culp Davis, 5 Administrative Law Treatise § 29:7 (1984); Matthew J. McGrath, Note, *Convergence of the Substantial Evidence and Arbitrary and Capricious Standards of Review During Informal Rulemaking*, 54 Geo. Wash.L.Rev. 541 (1986).

5. The district court found that the EPA claimed a potential loss of 425 acres of wetlands. In fact, the Final Determination After Remand states that the project would destroy 381 acres of wetlands and 44 acres of palustrine, estuarine, or lacustrine open water systems.

ceded that freshwater habitat would expand from the project and that the breached dam would help anadramous fish, the administrative record supports its conclusion that the project nevertheless would cause significant harm. The record also supports the EPA's finding that insufficient data on the Great Blue Heron prevents a conclusion that replacement rookeries will adequately mitigate the harm from the destroyed rookery.

Finally, the court noted that the EPA had overlooked the extent of development that would occur around the wetland area if the dam was not built, noting that the Chesapeake Corporation, the company owning much of the land in the area, was committed to harvesting timber and developing the area for residential and other uses. After reviewing the administrative record, however, the EPA concluded that the record did not support a finding that development of the Ware Creek watershed would be more environmentally damaging without the project. The EPA noted that the Chesapeake Corporation's plans for the area were uncertain. While it is possible that the company will engage in timbering and development activities if the reservoir is not constructed, the record also shows that the company has considered including "buffer zones, storm water management ponds and wetland areas to protect the Ware Creek watershed."

The EPA based its veto decision on several factors, including harm to existing fish and wildlife species, damage to the ecosystem, destruction of wetlands, and inadequate mitigation. Its findings are supported by the administrative record, are not arbitrary and capricious, and, for that matter, are supported by substantial evidence. Consequently, the judgment of the district court is reversed.

*REVERSED.*